IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br><br><br><br><br><br><br>       vs.<br><br><br>MANUEL CRUZ MENDEZ,<br><br>    Defendant. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS, DENYING DEFENDANT'S MOTION FOR SANCTIONS OVER JENCKS ACT VIOLATIONS, AND DENYING DEFENDANT'S MOTION FOR ADDITIONAL SANCTIONS<br><br><br><br>Case No. 2:05-CV-41 TS |

     This matter came before the court on March 31 and April 1, 2005, for hearing on Defendant's Motion to Suppress.  Briefing was completed on May 31, 2005.

     In addition, in response to some of the testimony given at the hearing for the Motion to Suppress, Defendant submitted his Motion for Sanctions Over Jencks Act Violations and Defendant's Motion for Additional Sanctions.  While the Court resolved part of Defendant's Motion for Sanctions Over Jencks Act Violations in its June 8, 2005 Memorandum Decision and

Order, the Court will first address what remains of Defendant's Motion for Sanctions Over Jencks Act Violations, along with Defendant's Motion for Additional Sanctions.  After resolving these motions, the Court will turn to Defendant's Motion to Suppress.

## I.  DEFENDANT'S MOTIONS FOR SANCTIONS

The Court previously denied the aspect of Defendant's Motion for Sanctions Over Jencks Act Violations that argues that the government should have provided Defendant a copy of Agent Gamarra's grand jury testimony prior to Defendant's cross-examination of Agent Gamarra.  The Court now addresses the part of the Motion for Sanctions Over Jencks Act Violations that avers that the government should have provided the Defendant a copy of the prosecutor's notes, which were taken during interviews of Agent Derewonko and Officer MacFarlane, before Defendant cross-examined Agent Derewonko and Officer MacFarlane.

The Court has now reviewed the prosecutor's notes, in camera.  The Court finds that these notes do not qualify as a statement under the Jencks Act.  Rather than reflecting a "substantially verbatim recital of an oral statement," the notes are a cryptic combination of simple words and phrases organized in a way that is indicative of the prosecutor's thoughts and strategy and not of the witnesses' rendition of events.  The Court will, therefore, deny Defendant's Motion for Sanctions Over Jencks Act Violations.

The Court has also reviewed Defendant's Motion for Additional Sanctions.  This Motion argues that Defendant was somehow prejudiced by the length of the prosecutor's memorandum in response to Defendant's Motion to Suppress.  The Court has reviewed the memorandum at issue, and the Court notes that while it has a lengthy factual section, the memorandum conforms

2

with DUCivR 7-1, which is made applicable to this criminal proceeding by DUCrimR 12-1(b).  It includes ten pages of argument, which is permissible, and the additional pages do not count toward the page limit at issue by the express terms of the local rule.  The Court finds that no sanction is warranted and, therefore, denies Defendant's Motion for Additional Sanctions.

## II.  MOTION TO SUPPRESS

While the Court notes that some conflict exists in the evidence before it, the Court finds and concludes that the most credible evidence before it is as follows:

### A.  FINDINGS OF FACT

On December 17, 2004, Agent Derewonko of the Department of Homeland Security received an anonymous tip from a female caller that an individual named Manuel Cruz Mendez was staying in a Provo apartment.  The caller left an address where Mr. Cruz Mendez could be found in Provo, Utah.  According to the caller, Mr. Cruz Mendez had several past narcotics convictions.  The caller reported that her husband had seen Mr. Cruz Mendez in the apartment that morning.  The caller hung up when Agent Derewonko asked if he could have her number in case he had further questions.

Agent Derewonko did not run a criminal background check based on this anonymous tip because he did not have enough information, specifically, he did not have Mr. Cruz-Mendez's birth date.  However, he did determine that he would act on this information and would stop by the address provided by the caller.

Agent Derewonko contacted another Homeland Security Department Agent, Agent Gamarra, to ask him if he could meet him at the Provo address.  Given what the caller said about

Mr. Cruz-Mendez's past criminal history with narcotics, Agent Derewonko thought Mr. Cruz Mendez may pose a significant safety risk. On this basis, he also contacted the Provo Police Department. Additionally, Agent Derewonko thought that since he and Agent Gamarra were wearing civilian clothes, having uniformed officers present would help those at the address clearly identify the agents as being from a law enforcement agency.

Agent Derewonko arrived at the apartment complex first. He ran a check of the license plates of several cars and none of them were connected to Mr. Cruz Mendez. Officer Moore of the Provo City Police Department and Agent Gamarra arrived shortly thereafter. Agent Derewonko briefed them on the information he had received from the anonymous phone call.

At about 8:00 a..m., the three officers approached the apartment identified by the caller and knocked on the door. The apartment was rented by Mr. Cruz Mendez's girlfriend. The girlfriend's brother answered the door. He had stopped by his sister's apartment to borrow her video system. The officers introduced themselves, and Agent Derewonko asked the brother for identification. He provided a resident alien card.

The officers then noticed who is now known to be Mr. Cruz Mendez's girlfriend. She had just gotten out of bed and was still in her pajamas. One of the officers asked her and her brother if they had any information about Manuel Cruz Mendez. They both told the officers that they did not know Mr. Cruz Mendez and that nobody else was in the apartment. The officers returned to the apartment's parking lot.

Officer Moore returned to his patrol car and contacted his partner, Officer MacFarlane. Officer MacFarlane indicated that he had also recently received a call from an anonymous female

caller.  The caller had provided Officer MacFarlane the same information Agent Derewonko received.  In addition, the caller had told Officer MacFarlane that Mr. Cruz Mendez was staying with his girlfriend.  The caller gave Officer MacFarlane the first name of Mr. Cruz Mendez's girlfriend.  Officer MacFarlane also indicated that he believed there was an arrest warrant out of Salt Lake City for a narcotics violation for Mr. Cruz Mendez.

Shortly after receiving this information, the officers saw the girlfriend's brother leaving her apartment.  Officer MacFarlane then arrived on the scene.

At approximately 8:20 a.m. the four officers returned to the girlfriend's apartment.  She answered the door.  Agent Derewonko informed her that the officers had received additional information that Mr. Cruz Mendez's girlfriend happened to have her same first name.  Agent Derewonko also asked her if the officers could enter her apartment due to the cold weather.  Mr. Cruz Mendez's girlfriend invited the officers into her apartment.

Agent Derewonko again asked her if she knew Manuel Cruz Mendez.  She said that she did not.  He asked her if there were any guns in the apartment.  She answered, "No."

Agent Derewonko asked her to show the officers her identification in order to confirm her name.  She stated that her identification was in her car.  While she went to her car to retrieve her identification, the officers waited outside her apartment.  She returned with a Utah driver's license and again allowed the officers into her apartment.

Shortly after she retrieved her driver's license, Officer MacFarlane left the apartment and positioned himself behind the apartment where he could monitor the windows of the apartment.

5

Agent Derewonko asked if he could inspect her bathroom for the officer's safety. The bathroom was located near the living room where the officers were standing. She allowed him to do so and followed him to the bathroom. Agent Derewonko inspected the bathroom and determined that it was empty. While Agent Derewonko and Mr. Cruz Mendez's girlfriend checked the bathroom, the other officers waited and looked around the room. Officer Moore focused on the girlfriend's pictures. According to Officer Moore's testimony, even though the officers did not have a picture of Mr. Cruz Mendez at the time, he was looking for pictures that would make a connection between the girlfriend and Mr. Cruz Mendez.

When Agent Derewonko and the girlfriend returned, she voiced her displeasure that the officers were looking around the living room and particularly at the pictures she had displayed in that room. However, she did not ask the officers to leave.

In the meantime, Officer MacFarlane decided to return to the police station several blocks away in order to get a picture of Mr. Cruz Mendez and a copy of the warrant he thought pertained to Mr. Cruz Mendez.

Agent Derewonko asked what her status was in the United States. When she claimed that she was a legal resident, Agent Derewonko asked to see supporting documents. She went to her bedroom to get her papers and then produced them for the officers. She refused to allow Agent Derewonko into her bedroom.

Agent Derewonko asked if he could search her apartment and make sure that Mr. Manuel Cruz was not on the premises. She refused. Agent Derewonko and Agent Gamarra then asked her several more times for her consent to search the apartment. She refused to permit the search.

6

Agent Gamarra then told her that if the officers were not permitted to search the apartment, he would obtain a warrant. He explained that with the warrant, the officers would be permitted to look any place a person could hide. Mr. Cruz Mendez's girlfriend still did not ask the officers to leave her apartment.

During this conversation, Officer Moore continued to look around the living room. As he looked around the room, he noticed a black jacket on a love seat immediately adjacent to the officers. He shined his flashlight on the jacket and noticed a cell phone protruding from the pocket. While he did not touch the jacket, he bent over, shined a flashlight on the phone, and inspected the phone. Etched on the phone were the letters "CRUZ."

Officer Moore got Agent Gamarra's attention. Agent Gamarra saw the word "CRUZ" on the cell phone without touching the jacket or using a flashlight.

Mr. Cruz Mendez's girlfriend became emotional once she realized that Agent Gamarra had seen the phone, and a worried look came over her face. She then pointed outside and whispered that she wanted to talk to Agent Gamarra outside.

Agent Gamarra asked, "For our safety, we need to know if he is in here."

She motioned to the bedroom and exited the apartment. Agent Gamarra followed her and signaled to Agent Derewonko to watch the bedroom as he exited.

The girlfriend and Agent Gamarra went outside leaving the officers in the apartment. Agent Gamarra asked her if "Cruz" was in the apartment. She responded, "Yes." She indicated that he was in the bedroom closet. She requested that the officers pretend to barge in the room

without her permission because she was afraid of the Defendant.  This conversation lasted no more than thirty seconds.

Agent Gamarra returned to the apartment, informed Agent Derewonko that the Defendant was in the bedroom closet.  As the officers made their way into the bedroom, Mr. Cruz Mendez's girlfriend cried out, "Don't take him."  Agent Derewonko opened the closet and discovered Mr. Cruz Mendez hiding under a pile of men and women's clothes.

Mr. Cruz Mendez had been an overnight guest at his girlfriend's apartment, as he had been consistently for approximately one month prior to this incident.  Mr. Cruz Mendez was wearing pajama pants but no shirt or shoes.

Mr. Cruz Mendez was handcuffed and placed on a bed.  Mr. Cruz Mendez was read his *Miranda* rights.  Mr. Cruz Mendez indicated that he understood these rights.  About thirty minutes had lapsed from the time the officers entered the apartment until the time of Mr. Cruz Mendez's arrest.

After the arrest, it was discovered that the warrant out of Salt Lake City was not for Mr. Cruz Mendez but for a different person, with a similar name.

### B.  CONCLUSIONS OF LAW

Defendant moves to suppress evidence pertaining to his arrest because he contends that (1) the police did not have probable cause to arrest the Defendant; (2) Mr. Cruz Mendez's girlfriend did not consent to a search of the apartment or alternatively her consent was coerced; (3) the officer's search of the home exceeded the scope of the girlfriend's consent; and (4) all fruits of the search, including Defendant's identity, should be suppressed.  The government

contends that (1) Mr. Cruz Mendez does not have standing to contest the lawfulness of the law enforcement officer's entry into the apartment; (2) the search did not extend beyond the consent given by Mr. Cruz Mendez's girlfriend; (3) even if consent was not given, exigent circumstances allowed law enforcement to enter the girlfriend's bedroom; (4) Mr. Cruz Mendez has no expectation of privacy after a crime was initiated in the presence of law enforcement and after an illegal entry has occurred; (5) Defendant's identity is not suppressible; and (6) even if an arrest is unlawful, the government can require the Defendant to produce a post-indictment fingerprint.

### 1.     Mr. Cruz Mendez has standing to challenge the officers' search

In order to establish standing to challenge the officers' search, Defendant "bears the burden of demonstrating that he had a personal Fourth Amendment interest that was implicated by the search of the [apartment]."  U.S. v. Jones, 213 F.3d 1253, 1260 (10th Cir. 2000) (citing United States v. Benitez-Arreguin, 973 F.2d 823, 827 (10th Cir. 1992)).  However,

> "The test for determining standing is well-established, and relies upon two factors: (1) "'whether the individual, by his conduct has exhibited an actual (subjective) expectation of privacy,'" and (2) "'whether the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable.'" United States v. Dodds, 946 F.2d 726, 728 (10th Cir. 1991) (quoting Smith v. Maryland, 442 U.S. 735, 740 (1979)) (internal quotations omitted).

Jones, 213 F.3d at 1260.

The Court first turns to the question of whether Mr. Cruz Mendez has an expectation of privacy.  The Tenth Circuit has made clear that "an overnight guest in a hotel room or in the home of a friend has a legitimate expectation of privacy in the premises."  U.S. v. Garza, ___ F.3d ___, 2005 WL 237757 (10th Cir. 2005) (quoting United States v. Carr, 939 F.2d 1442, 1446

(10th Cir. 1991).  The Court finds that as his girlfriend's guest, Mr. Cruz Mendez had a legitimate privacy expectation.

The privacy found by the guest of one's home is not only a right that society has longed recognized but a privacy right society cherishes.  Clearly, as a guest in his girlfriend's apartment for approximately one month, Mr. Cruz Mendez has standing to challenge the search at issue.

### 2.  Mr. Cruz Mendez's girlfriend consented to the officers being in her living room

While warrantless searches are presumptively unreasonable under the Fourth Amendment to the United States Constitution, it is "well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  "Valid consent is that which is 'freely and voluntarily given.'"  United States v. Pena, 143 F.3d 1363, 1366 (10th Cir. 1998) (internal citation omitted).  Whether voluntary consent was given "is a question of fact and is determined from the totality of all of the circumstances."  United States v. Santurio, 29 F.3d 550, 552 (10th Cir. 1994).  "The government has the burden of proving valid consent to a warrantless search.  First, it must present 'clear and positive testimony that consent was unequivocal and specific and freely and intelligently given.'  Second, the government must show that the police did not coerce the defendant into granting his consent."  Pena, 143 F.3d at 1366. (internal citations omitted).

All the evidence before the Court suggests that Mr. Cruz Mendez's girlfriend voluntarily allowed the officers to enter her living room.  Even though she objected several times to requests of the officers to perform a complete search of her apartment and showed frustration when the

officers were examining what was in plain view in her living room, she never asked the officers to leave.  In fact, when she went to get her identification from her car, the officers exited the apartment with her, and she allowed them to re-enter her apartment when she returned.  In this case, the Court finds that her consent for the officers to enter the living room was unequivocal and freely given with no duress.

### 3.  Mr. Cruz's cell phone was in plain view in the living room

Implicit with the girlfriend's consent for the officers to enter her living room is also consent for the officers to "inspect those matters which were in plain view."  Noble Steel, Inc. v. Occupational Safety and Health Review Com'n, 72 F.3d 138, 139 (10th Cir. 1995).

The Court finds that the most credible reading of the evidence suggests that almost immediately next to the officers rested a black jacket on the arm of a love seat.  While Officer Moore used a flashlight to inspect a cell phone that was protruding from the jacket pocket, the Court finds that the cell phone was in plain view and was protruding from the pocket of the jacket.  Agent Gamarra was able to the read the word "CRUZ" on the phone without the aid of a flashlight and without disturbing the jacket.  The Court finds that the observation of the phone was implicit in the consent given by Mr. Cruz Mendez's girlfriend for the officers to enter her apartment living room.

### 4.  Mr. Cruz Mendez's girlfriend consented to the search of her bedroom

The Court has previously laid out the standard governing consent.  The Court notes that once Mr. Cruz Mendez's girlfriend realized that the officers had seen Mr. Cruz Mendez's phone, she then asked to speak to Agent Gamarra outside of her apartment.  She then told him that the

11

Defendant was hiding in her bedroom closet.  She told Agent Gamarra that he could enter her bedroom and retrieve Mr. Cruz Mendez; however, she insisted that Agent Gamarra not let the Defendant know that she had consented.  The evidence received by the Court indicates that the girlfriend gave her verbal consent for the officers' search of her bedroom.  The Court finds this consent was made unequivocally, specifically, freely and intelligently.

While Defendant argues that Mr. Cruz Mendez's girlfriend was coerced, the Court finds otherwise.  Given the totality of the circumstances, once she realized that the officers had discovered the cell phone with the word "CRUZ" on it, she readily consented to Agent Gamarra's request to search her bedroom for Mr. Cruz Mendez.  However, even before she provided this consent, the Court finds that while the officers were persistent, there is no evidence to suggest that the officers were overly threatening or forceful, or that they coerced the consent in any way.  Defendant has argued that the officers threatened to arrest Mr. Cruz Mendez's girlfriend; however, the Court finds that the officers simply told her what would happen if the officers received a warrant.  As such, the consent was valid, and the officers were legally justified in their search of the apartment bedroom.

### 5.  Probable Cause Existed to Arrest Mr. Cruz Mendez

The Court next turns to the issue of whether the government had probable cause to arrest Defendant.  The Court adopts the explanation of probable cause offered in the case <u>United States v. Soto</u>, 375 F.3d 1219 (10th Cir. 2004):

> "Probable cause to arrest exists only when the facts and
> circumstances within the officers' knowledge, and of which they
> have reasonably trustworthy information, are sufficient in
> themselves to warrant a man of reasonable caution in the belief that

> an offense has been or is being committed." <u>United States v.
> Valenzuela</u>, 365 F.3d 892, 896 (10th Cir. 2004) (internal quotation
> marks omitted). "Probable cause does not require facts sufficient
> for a finding of guilt; however, it does require more than mere
> suspicion." <u>United States v. Morris</u>, 247 F.3d 1080, 1088 (10th
> Cir. 2001) (internal quotation marks omitted).  "Probable cause is
> measured against an objective standard....  [T]he primary concern
> is whether a reasonable officer would have believed that probable
> cause existed to arrest the defendant based on the information
> possessed by the arresting officer." <u>Valenzuela</u>, 365 F.3d at
> 896-97.

<u>Id.</u> at 1222.

The Court notes that the officers had the following information according to the evidence: (1) the federal agents and the city police had both received separate but collaborating anonymous calls, in which the caller reported that a "Manuel Cruz Mendez," who was a previously deported convicted felon, was now residing in the Provo area; (2) the caller left the same address for Mr. Cruz Mendez in both calls; (3) the caller to the city officer identified Mr. Cruz Mendez's girlfriend by her first name; (4) at the time of Mr. Cruz Mendez's arrest, the officers knew that Mr. Cruz Mendez's girlfriend had lied about Mr. Cruz Mendez's presence in her apartment and that Mr. Cruz Mendez had hid in the closet from the officers; and (5) at the time the officers arrested Mr. Cruz Mendez, they assumed a warrant issued for a person with a name similar to Mr. Cruz Mendez applied to Mr. Cruz Mendez.

The Court finds that the information available to the officers is more than ample to meet the probable cause standard.

**6.  Other aspects of government's argument moot**

The Court has found that the search that resulted in the police finding Mr. Cruz Mendez
was based on the voluntary consent of his girlfriend.  Furthermore, the Court has found that Mr.
Cruz Mendez's arrested was based on probable cause.  The Court, therefore, deems the
remaining aspects to the government's opposition moot.

### III.  ORDER

Based upon the foregoing, it is therefore

ORDERED that Defendant's Motion for Sanctions Over Jencks Act Violations is
DENIED.  It is further

ORDERED that Defendant's Motion for Additional Sanctions is DENIED.  It is further

ORDERED that Defendant's Motion to Suppress is DENIED.  It is further

ORDERED that the time from the filing of the Motion to Suppress through the date of
June 30, 2005, is excluded from the computation of the Speedy Trial Act time pursuant to 18
U.S.C. § 3161(h)(1)(F) and (J).

DATED June 30, 2005.

BY THE COURT:

_____
TED STEWART
United States District Judge

14